James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
  **BRODY, & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*Attorney for Plaintiff*

[*Additional Attorneys On Signature Page*]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Martha A. Page,<br><br>                    Plaintiff,<br><br>v.<br><br>RB HEALTH (US) LLC, KENVUE INC., MCNEIL CONSUMER HEALTHCARE, JOHNSON & JOHNSON CONSUMER, INC.<br><br>                    Defendants. | No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Martha A. Page ("Plaintiff") brings this action on behalf of herself

and all others similarly situated against Defendants RB Health (US) LLC

("Reckitt"), Kenvue Inc. ("Kenvue"), McNeil Consumer Healthcare ("McNeil"),

Johnson & Johnson Consumer, Inc ("J&J") (collectively, "Defendants"). Plaintiff

makes the following allegations upon information and belief, the investigation of her counsel, and personal knowledge or facts that are a matter of public record.

## INTRODUCTION

1.    By this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals who purchased over-the-counter nasal decongestant products containing phenylephrine ("PE") developed, marketed, distributed, sold and/or manufactured by Defendants.

2.    Defendants' PE products include, but are not limited to:

- Benadryl Allergy Plus Cold (Kenvue/McNeil)

- Benadryl Allergy Plus Congestion (Kenvue/McNeil)

- Children's Benadryl Allergy Plus Congestion (Kenvue/McNeil)

- Tylenol Cold & Flu Severe (Kenvue/McNeil)

- Tylenol Cold + Flu + Cough Nighttime Liquid (Kenvue/McNeil)

- Tylenol Sinus + Headache (Kenvue/McNeil)

- Tylenol Sinus Severe Day (Kenvue/McNeil)

- Tylenol Sinus Severe Nighttime (Kenvue/McNeil)

- Tylenol Cold + Flu Severe for Day and Nighttime (Kenvue/McNeil)

- Tylenol Cold + Flu Severe Day Liquid (Kenvue/McNeil)

- Tylenol Extra Strength Cold + Flu Multi-Action Daytime (Kenvue/McNeil)

- Children's Tylenol Cold & Flu Liquid (Kenvue/McNeil)

- Sudafed PE Cold + Cough (J&J)

- Sudafed PE Head Congestion + Flu Severe (J&J)

- Sudafed PE Head Congestion + Pain (J&J)

- Sudafed PE Sinus Congestion (J&J)

- Sudafed PE Sinus Congestion Nighttime (J&J)

- Sudafed PE Sinus Pressure + Pain (J&J)

- Sudafed Sinus 12 Hour Pressure + Pain (J&J)

- Sudafed PE Head Congestion + Mucus (J&J)

- Sudafed PE Head Congestion + Flu Severe (J&J)

- Children's Sudafed PE (J&J)

- Children's Sudafed PE Cold + Cough (J&J)

- PediaCare Daytime Multi-Symptom Cold (J&J)

- PediaCare Nighttime Multi-Symptom Cold (J&)

- Delsym Children's Night Time Cough & Cold (Reckitt)

- Delsym Night Time Multi-Symptom (Reckitt)

- Mucinex Children's Day Time & Night Time Multi-Symptom Cold Value Pack (Reckitt)

- Mucinex Children's FreeFrom Multi-Symptom Cold & Flu Nighttime (Reckitt)

- Mucinex Children's Multi-Symptom Cold (Reckitt)

- Mucinex Fast-Max Day & Night (Reckitt)

- Mucinex Fast-Max Day Severe Cold (Reckitt)

- Mucinex Fast Max Cold Flu and Sore Throat (Reckitt)

- Mucinex Fast-Max Day Time Cold & Flu and Night Time Cold & Flu Maximum Strength (Reckitt)

- Mucinex Fast-Max Day Time Severe Cold and Night Time Cold & Flu Maximum Strength (Reckitt)

- Mucinex Fast-Max Day Time Severe Congestion & Cough and Night Time Cold & Flu Maximum Strength (Reckitt)

- Mucinex Fast-Max Night Cold & Flu (Reckitt)

- Mucinex Fast-Max Night Time Cold & Flu (Reckitt)

- Mucinex Fast-Max Severe Cold (Reckitt)

- Mucinex Fast-Max Severe Congestion & Cough (Reckitt)

- Mucinex FreeFrom Cold & Flu Daytime (Reckitt)

- Mucinex FreeFrom Cold & Flu Nighttime (Reckitt)

- Mucinex Nightshift Cold & Flu (Reckitt)

- Mucinex Nightshift Cold & Flu Clear & Cool (Reckitt)

- Mucinex Nightshift Severe Cold and Flu (Reckitt)

- Mucinex Nightshift Sinus (Reckitt)

- Mucinex Nightshift Sinus Clear & Cool (Reckitt)

- Mucinex Sinus Max (Reckitt)

- Mucinex Sinus-Max Day & Night (Reckitt)

- Mucinex Sinus-Max Day & Night (Day) (Reckitt)

- Mucinex Sinus-Max Day and Night Maximum Strength (Reckitt)

- Mucinex Sinus-Max Pressure, Pain & Cough (Reckitt)

- Mucinex Sinus-Max Severe Congestion & Pain Maximum Strength (Reckitt)

Collectively, these products and Defendants' other PE products are referred hereafter as the "Products."

3.     Defendants market these Products as providing nasal decongestant relief and attribute the Products' ability to provide nasal decongestant relief to the inclusion of one active ingredient: PE.

4.     Plaintiff and the Class reviewed and relied on this marketing when purchasing Defendants' products including PE.

5.     On September 11 and 12, 2023, an advisory committee to the U.S. Food & Drug Administration ("FDA") unanimously agreed that PE, when taken orally, is not effective at relieving oral congestion. However, neither the FDA nor the advisory committee identified any safety issues with use of PE when taken orally at the recommended dose.

6.     Defendants knew and/or had reason to know, at all times material to Plaintiff's claims, that their Products were no more effective than placebo. Accordingly, Defendants' misrepresentations regarding the Products are false, misleading, and likely to deceive the public.

7.     Had Plaintiff and the Class known that these Products were ineffective as nasal and sinus decongestants when taken orally, she would not have purchased them or would have paid substantially less for them.

8.      Accordingly, Plaintiff, on behalf of herself and those similarly situated, seeks to hold Defendants accountable for their deception, misrepresentation, omissions, and breach of their obligations under applicable state and federal consumer protection laws.

**PARTIES**

**Plaintiff Page**

9.      Plaintiff Martha A. Page is a resident of Nueces County, Texas.

10.     Plaintiff purchased Defendants' Products, including but not limited to Sudafed PE Sinus Congestion (J&J), Benadryl Allergy Plus Congestion (Kenvue/McNeil), Mucinex Sinus-Max Pressure, Pain & Cough (Reckitt) during the Class Period.

11.     Plaintiff purchased Defendants' Products for many years to provide relief from sinus and nasal congestion. When making these purchases, Plaintiff relied on Defendants' marketing that Defendants' Products would be effective in providing relief from congestion.

12.     None of these orally ingested Products was effective in relieving nasal congestion. Had Defendants disclosed that phenylephrine is not effective in relieving nasal/sinus congestion, Plaintiff Page would not have purchased the products to orally remedy her nasal/sinus congestion or would have paid significantly less for them.

**Defendants**

13.     Defendant Kenvue Inc. is a Delaware consumer health company, and formerly the consumer healthcare division of Johnson & Johnson Consumer, Inc. Kenvue is headquartered in Skillman, New Jersey. During the Class Period, Kenvue acquired Defendant McNeil Consumer Healthcare. Defendant Kenvue has been engaged in the manufacturing, marketing, sale and distribution of misbranded and ineffective phenylephrine products, including but not limited to, its Benadryl and Tylenol product lines throughout the United States.

14.     Defendant McNeil Consumer Healthcare is wholly owned by Defendant Kenvue, with headquarters in Fort Washington, Pennsylvania. Defendant McNeil has been engaged in the manufacturing, marketing, sale and distribution of misbranded and ineffective phenylephrine products, including but not limited to, its Benadryl and Tylenol product lines throughout the United States.

15.     Defendant Johnson & Johnson Consumer, Inc. is a New Jersey based medical corporation, with its headquarters in New Brunswick, New Jersey. J&J has been engaged in the manufacturing, marketing, sale and distribution of misbranded and ineffective phenylephrine products, including but not limited to, its Sudafed, Tylenol and Benadryl product lines throughout the United States.

16.     Defendant RB Group (US) LLC is a Delaware limited liability corporation with its headquarters and principal place of business located in

Parsippany, New Jersey. Reckitt is a wholly-owned subsidiary of Reckitt

Benckiser Group plc, a public limited company registered in England and Wales.

Reckitt has been engaged in the manufacturing, marketing, sale and distribution of

misbranded and ineffective phenylephrine products, including but not limited to,

its Mucinex and Delsym product lines throughout the United States.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005

("CAFA"), 28 U.S.C. § 1711, et seq., because at least one member of the Class, as

defined below, is a citizen of a different state than Defendants, there are more than

100 members of the Class, and the aggregate amount in controversy exceeds

$5,000,000, exclusive of interest and costs. This Court also has diversity

jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

18.    The Court has personal jurisdiction over this action because each

Defendant conducts substantial business in this District, such that Defendants have

significant, continuous, and pervasive contacts with the State of New Jersey. As

such, Defendants have purposefully availed themselves of the laws and benefits of

doing business in this District such that they could reasonably foresee litigation

being brought in this District. Each of the Defendants markets and distributes its

products in New Jersey.

19.     The Court additionally and independently has personal jurisdiction over Defendants Kenvue, J&J and Reckitt, each of which operate from headquarters in New Jersey as indicated above.

20.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendants transact business within this District including marketing and selling Products.

## FACTUAL ALLEGATIONS

### A.    Over-the-Counter Oral Decongestants

21.     The market for nasal decongestants sees tens of billions of dollars in annual sales.[1] PE is the listed active ingredient in at least 250 orally administered nasal decongestants. PE comes in two varieties, phenylephrine hydrochloride ("PEH") and phenylephrine bitartrate ("BEP"). It has been used as the active ingredient in over-the-counter ("OTC") drugs for more than 75 years.

22.     Among the drugs that use PE are household staples such as Sudafed PE, Tylenol Cold & Flu Severe, Nyquil Severe Cold & Flu, Advil Sinus

---

[1] Nasal Spray Industry Analysis, GLOBAL MARKET INSIGHTS (May 2023), https://www.gminsights.com/industry-analysis/nasal-spray-market#:~:text=Nasal%20Spray%20Market%20size%20was,6.7%25%20from%202023%20to%202032 (last visited Sept. 29, 2023); C. Jewett & R. Rabin, *A Decongestant in Cold Medicines Doesn't Work at All, an F.D.A. Panel Says*, N. Y. TIMES (Sept. 12, 2023), https://www.nytimes.com/2023/09/12/health/cold-medicine-decongestant-fda.html? (last visited Sept. 29, 2023).

Congestion and Pain, and Mucinex Sinus Max. Together, these and other oral decongestants containing PE accounted for nearly $1.8 billion in sales in 2022.[2]

23.    The primary compound alternatively relied on as an active ingredient in oral decongestants is pseudoephedrine. But pseudoephedrine's use has declined over the years as federal law has restricted access to it.[3] Products containing pseudoephedrine are placed behind store counters or in locked cabinets, customers must be 18 or over and provide identification, and may only purchase a limited number of tablets at a time. Restrictions exist because of pseudoephedrine's role in the production of methamphetamine and were established by Congress's passage of the Combat Methamphetamine Epidemic Act of 2005.[4]

24.    Pseudoephedrine's decline has led to PE's rise. Aiming to avoid reduced sales because of pseudoephedrine restrictions and develop OTC alternatives, drug manufacturers turned to PE. By 2022, pseudoephedrine accounted for only around 20% of the oral nasal decongestant market while PE constituted closer to 80%.[5]

---

[2] C. Jewett & R. Rabin, *supra* note 1.

[3] C. Jewett & R. Rabin, *supra* note 1.

[4] *Methamphetamine Research Report*, NIH: NATIONAL INSTITUTE ON DRUG ABUSE (October 2019), https://nida.nih.gov/publications/research-reports/methamphetamine/how-methamphetamine-manufactured (last visited Sept. 29, 2023).

[5] Matthew Perrone, *Popular nasal decongestant doesn't actually relieve congestion, FDA advisers say*, PBS NEWSHOUR (Sept. 12, 2023), https://www.pbs.org/newshour/health/popular-nasal-decongestant-doesnt-

**B.    PE's Efficacy**

25.    But as drug manufactures turned their focus on marketing products containing PE, they ignored evidence that it is ineffective when taken orally.[6]

26.    PE is a vasoconstrictor often administered intravenously in hospital settings to address low blood pressure resulting from vasodilation.[7] When administered intranasally through a spray, its vasoconstricting properties operate to reduce nasal congestion.[8] PE's decongestant effect is purportedly also present when taken orally.[9]

27.    Not every method of PE delivery is equally efficacious. Studies reaching as far back as 1933 suggested that orally administered PE does not affect blood pressure until reaching dosage levels close to or over 100 mg.[10] By contrast, intravenous application typically sees several doses of between 50 and 100 *micro*grams, one thousandth the concentration.[11]

---

actually-relieve-congestion-fda-advisers-say#:%7E:text=WASHINGTON% 20(AP)%20%E2%80%94%20The%20leading,the% 20long%2Dquestioned%20drug%20ingredient (last visited Sept. 29, 2023).

[6] C. Jewett & R. Rabin, *supra* note 1.

[7] Phenylephrine StatPearl, NIH: NATIONAL LIBRARY OF MEDICINE (July 10, 2023), https://www.ncbi.nlm.nih.gov/books/NBK534801/ (last visited Sept. 29, 2023).

[8] *See* Nonprescription Drugs Advisory Committee, *Efficacy of Oral Phenylephrine as a Nasal Decongestant* (Sept. 12, 2023) at 13, https://www.fda.gov/media/171915/download (last visited Sept. 29, 2023).

[9] C. Jewett & R. Rabin, *supra* note 1.

[10] Nonprescription Drugs Advisory Committee, *supra* note 8.

[11] Phenylephrine StatPearl, NIH: NATIONAL LIBRARY OF MEDICINE (July 10, 2023), https://www.ncbi.nlm.nih.gov/books/NBK534801/ (last visited Sept. 29, 2023).

28.    A 1976 proposed FDA rule preliminarily approved PEH's suitability

as an active ingredient in orally administered nasal decongestants at only 10 mg.[12]

It largely relied on a series of in-house studies submitted by representatives of

pharmaceutical companies.[13] Of the remaining two studies with evaluable data, the

first was taken to indicate efficacy despite demonstrating no differences between

active versus placebo groups and the second, by Columbia University, indicated a

lack of efficacy.[14]

29.    A comment during the rulemaking process criticized the proposal,

summarized the state of unpublished studies as "split evenly between mild

successes and total failures," and cited a published study indicating no efficacy

even in high doses.[15] The advisory panel acknowledged that the data were "not

---

[12] Establishment of a Monograph for OTC Cold, Cough, Allergy, Bronchodilator and Antiasthmatic Products, 41 F.R. 38420 (Sept. 9, 1976), https://archives.federalregister.gov/issue_slice/1976/9/9/38248-38441.pdf#page=131 (last visited Sept. 29, 2023).

[13] Ronald Eccles, *Substitution of phenylephrine for pseudoephedrine as a nasal decongestant. An illogical way to control methamphetamine abuse*, 63(1) Br. J. Clinical Pharmacology 10 (Jan. 2007) ), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2000711/ (last visited Sept. 29, 2023); Nonprescription Drugs Advisory Committee, *supra* note 8, at 17.

[14] Nonprescription Drugs Advisory Committee, *supra* note 8, at 18-20.

[15] *See* Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use;

Tentative Final Monograph for Over-the-Counter Nasal Decongestant Drug Products, 50 F.R. 2226 (Jan. 15, 1985), https://archives.federalregister.gov/issue_slice/1985/1/15/2198-2241.pdf#page=29 (last visited Sept. 29, 2023).

strongly indicative of efficacy" but nevertheless recommended that the FDA categorize oral PEH as safe and effective.[16]

30.    Based on these data, the FDA declared PEH effective at a 10 mg dose in a tentative final monograph in 1985 and a final monograph in 1994.[17] It added PEB to the monograph in 2006, concluding it is comparable to PEH.[18]

31.    The monograph designated PE-containing products as generally recognized as safe and effective (GRASE) when taken orally at the specified dosage.[19] This status permits pharmaceutical companies such as the Defendants to market products containing GRASE ingredients directly to consumers as over-the-counter medications.

32.    However, a 2007 meta-analysis of the scientific literature concluded that insufficient evidence supported oral PE being effective as a nasal decongestant at the monographed dosage. It showed instead that PE is no more effective than a placebo.[20]

---

[16] *Id.*

[17] Nonprescription Drugs Advisory Committee, *supra* note 8, at 11-12.

[18] Amended Final Monograph, 71 F.R. 43358 (Aug. 1, 2006), https:// www.govinfo.gov/content/pkg/FR-2006-08-01/pdf/E6-12265.pdf (last visited Sept. 29, 2023).

[19] Nonprescription Drugs Advisory Committee, *supra* note 8, at 18-20.

[20] R. Hatton et al., *Efficacy and safety of oral phenylephrine: systematic review and meta-analysis*, 41(3) ANN. OF PHARMACOTHERAPY 381, https://pubmed.ncbi.nlm.nih.gov/17264159/ (last visited Sept. 29, 2023).

33.    Citizen petitioners relying on the meta-analysis challenged the FDA's PE approval.[21] In addition to the meta-analysis, they presented two recent placebo-controlled studies from reputable laboratories that demonstrated no benefit to PE over a placebo.[22] Both studies were published subsequently, in 2009.[23]

34.    After considering the petition, the FDA's Nonprescription Drugs Advisory Committee recommended further investigation.[24] It suggested trials to evaluate individuals' subjective symptom scores rather than using a "nasal airway resistance" score relied on in many of the studies reviewed for the initial monograph.[25] By doing so, the committee did no more than insist on established best practices.[26]

35.    By 2016, two larger studies had been conducted and published confirming that PE is ineffective when taken orally.[27] A third study, sponsored by

---

[21] Nonprescription Drugs Advisory Committee, *supra* note 8, at 23.

[22] *Id*. at 28, 37.

[23] Day et al., *Efficacy of loratadine-montelukast on nasal congestion in patients with seasonal allergic rhinitis in an environmental exposure unit*, 102(4) ANN. ALLERGY ASTHMA & IMMUNOLOGY 328, https://pubmed.ncbi.nlm.nih.gov/19441605/ (last visited Sept. 29, 2023); Horak et al., *A placebo-controlled study of the nasal decongestant effect of phenylephrine and pseudoephedrine in the Vienna Challenge chamber*, 102(2) ANN. ALLERGY ASTHMA & IMMUNOLOGY 116, https://pubmed.ncbi.nlm.nih.gov/19230461/ (last visited Sept. 29, 2023).

[24] Nonprescription Drugs Advisory Committee, *supra* note 8, at 30.

[25] *Id*.

[26] *Id*. at 56.

[27] Meltzer et al., *Oral Phenylephrine HCl for Nasal Congestion in Seasonal Allergic Rhinitis: A Randomized, Open-label, Placebo-controlled Study*, 3(5) J.

Johnson & Johnson Consumer Inc., also indicated that PE is ineffective but was never published.[28]

36.    The development of further scholarship precipitated a second citizen petition in 2015, now supported by the American Academy of Allergy, Asthma & Immunology.[29] It sought the removal of oral PE from the monograph.

37.    In 2018, while its consideration of PE was pending, the FDA released industry guidelines concerning the appropriate method by which to determine the efficacy of treatments of allergic rhinitis—congestive symptoms created by an

---

ALLERGY & CLINICAL IMMUNOLOGY IN PRACTICE 702 (Sept. 2015), https://pubmed.ncbi.nlm.nih.gov/26143019/ (last visited Sept. 29, 2023); Meltzer et al., *Phenylephrine hydrochloride modified-release tablets for nasal congestion: a randomized, placebo-controled trial in allergic rhinitis patients*, 116(1) ANN. OF ALLERGY ASTHMA & IMMUNOLOGY 702 (Jan. 2016), https://pubmed.ncbi.nlm.nih.gov/26560899/ (last visited Sept. 29, 2023). *See also* Nonprescription Drugs Advisory Committee, *supra* note 8, at 42-51.

[28] Randomized, Double-blind, Placebo-Controlled, Efficacy Study of a New Formulation of Phenylephrine HCL in the Common Cold, CLINICALTRIALS.GOV (June 4, 2019), https://classic.clinicaltrials.gov/ct2/show/NCT03339726 (last visited Sept. 29, 2023). *See also* Nonprescription Drugs Advisory Committee, *supra* note 8, at 51-54.

[29] Citizen's Petition, CITELINE (Nov. 4, 2015), https://pink.citeline.com/-/media/pmbi-old-site/supporting-documents/the-tan-sheet/23/45/45-citizens-petitionphenylephrinenovember-2015.pdf (last visited Sept. 29, 2023); American Academy of Allergy, Asthma & Immunology and American College of Allergy, Asthma & Immunology's Statement of Support of Citizens' Petition for Removal of Oral Phenylephrine from Over-the-Counter Status, ACAII.ORG, https://college.acaai.org/wp-content/uploads/2022/05/oral-phenylephrine-final-statement-in-support-of-citizens-petition-05-4-22.pdf. (last visited Sept. 29, 2023).

allergic reaction.[30] Consistent with the 2007 recommendation in the PE context, it moved toward subjective symptom scores rather than suggesting use of nasal airway resistance.

38.     Meanwhile, thorough review by the FDA's clinical and clinical pharmacology teams progressed. The teams concluded in a 2023 report that clinically relevant responses to orally administered PE do not occur until doses of around 80 to 100 mg.[31] The teams also scrutinized and criticized the studies presented to the panel that originally affirmed PE's efficacy. They described these studies as "highly problematic in both design and methodology" and not meeting modern research standards.[32]

39.     Consequently, on September 11 and 12 of this year, an advisory committee to the FDA unanimously concluded that orally administered PE is ineffective to treat nasal congestion; it is no better than a placebo.[33] Neither the FDA nor the advisory committee identified any safety issues with PE taken orally at recommended dosages. Withdrawal of PE's GRASE designation seems likely to follow.

---

[30] Allergic Rhinitis: Developing Drug Products for Treatment, Guidance for Industry, FDA.GOV (Sept. 2018), https://www.fda.gov/files/drugs/published/Allergic-Rhinitis--Developing-Drug-Products-for-Treatment-Guidance-for-Industry.pdf (last visited Sept. 29, 2023).
[31] Nonprescription Drugs Advisory Committee, *supra* note 8, at 31.
[32] *See also id.* at 54.
[33] C. Jewett & R. Rabin, *supra* note 1.

40.     Defendants had access to all of this information. Thus, since at least 2007, the Defendants either knew or, as sophisticated drug manufacturers, should have known that the best available scientific data, gathered using the most modern research methods, demonstrate that PE is ineffective to treat nasal decongestion when taken orally. By 2016, with the addition of two more large and reliable studies and with no further studies indicating otherwise, the scientific consensus was unmistakable. By 2018, the FDA's move toward use of subjective symptom scores in its industry guidelines placed the Defendants on further notice not to rely on older studies using nasal airway resistance.

## C.    Defendants' False Advertising

41.     Defendants have to this day persisted in aggressively and misleadingly advertising PE-containing OTC orally administered nasal decongestants to consumers across the United States. Defendants have falsely presented their products as effective and thereby accrued billions of dollars in profit.

42.    For instance, online marketing for defendant Johnson & Johnson's Sudafed PE Sinus Congestion *still* describes it as "provid[ing] maximum-strength sinus pressure and nasal congestion relief with a non-drowsy formula that contains phenylephrine HCl as a nasal decongestant."[34] Its packaging reflects this



promise[35]:

Johnson & Johnson sold its Tylenol Cold & Flu product using much the same representations on its packaging, listing PE as the active ingredient relieving nasal congestion.[36]

43.    Johnson & Johnson's successors in the manufacture and sale of these drugs—defendants Kenvue Inc. and McNeil Consumer Healthcare—have similarly

---

[34] SUDAFED PE® Sinus Congestion, SUDAFED.COM, https://www.sudafed.com/products/sudafed-pe-sinus-congestion (last visited Sept. 25, 2023).

[35] Screenshots taken from SUDAFED PE® Sinus Congestion, SUDAFED.COM, https://www.sudafed.com/products/sudafed-pe-sinus-congestion (last visited Sept. 25, 2023).

[36] Label: Tylenol Cold Plus Flue Severe Day/Night, NIH NATIONAL LIBRARY OF MEDICINE, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=2ddb86a8-e34c-4a03-a60a-d3fedaf90608 (last visited Sept. 25, 2023).

marketed their products based on inaccurate statements of PE's efficacy. For instance, online marketing for Benadryl Allergy Plus Congestion *still* describes it as providing "relief from sinus pressure and nasal congestion."[37] Its packaging reflects this promise[38]:



44.    This approach is typical of other companies' behavior when selling orally administered nasal decongestants. Defendant Reckitt marketed its Mucinex Sinus-Max Pressure, Pain & Cough as a one-stop solution to common cold

---

[37] Benadryl Allergy Plus Congestion, BENADRYL.COM, https://www.benadryl.com/products/benadryl-allergy-plus-congestion (last visited Oct. 2, 2023).

[38] Screenshot taken from Benadryl Allergy Plus Congestion, BENADRYL.COM, https://www.benadryl.com/products/benadryl-allergy-plus-congestion (last visited Oct. 2, 2023).

symptoms, including nasal congestion.[39] Its packaging listed PE as the only active ingredient addressing congestion issues.[40]



45.    Regarding these and their other PE-containing products, the Defendants promised consumers relief from sinus and nasal congestion. They advertised PE as the active ingredient that would provide that relief. They did so through the products' labeling and in other communications and marketing. They

---

[39] Mucinex Sinus-Max Pressure, Pain & Cough Liquid Gels, MUCINEX.COM, https://www.mucinex.com/products/mucinex-sinus-max-max-strength-pressure-pain-cough-liquid-gels-16ct (last visited Oct. 4, 2023).

[40] Screenshot taken from Mucinex Sinus-Max Pressure, Pain & Cough Liquid Gels, MUCINEX.COM, https://www.mucinex.com/products/mucinex-sinus-max-max-strength-pressure-pain-cough-liquid-gels-16ct (last visited Oct. 4, 2023).

acted despite the state of the scientific literature and without warning consumers that the products were ineffective for their advertised purpose.

46.    Plaintiff and the Class Members reasonably relied on the Defendants' deceptive marketing, purchased their products, and suffered economic damages including the cost of their purchase.

**D.    Tolling of Applicable Statutes of Limitations**

47.    All claims in this complaint have been brought within the applicable statutes of limitations because the statutes have been tolled by operation of the discovery rule. Plaintiff and Class Members did not discover the existence of their injuries until shortly before filing this action. Nor, as unsophisticated consumers, could they have done so through the application of reasonable diligence. Instead, they reasonably relied on Defendants' representations of PE's efficacy as an orally administered nasal decongestant. Only once the FDA advisory committee released its September 2023 decision did Plaintiff and Class Members become aware of their injuries and did their claims accrue. As a result, under the discovery rule, the applicable statutes of limitations did not begin to run until the committee released its decision.

48.    The statutes of limitations applicable to this complaint's claims have also been tolled by the equitable tolling doctrine. Until recently, Plaintiff and Class Members could not by the exercise of reasonable diligence have discovered

essential information bearing on their claims. Any applicable limitations are therefore tolled.

49.    Additionally, and alternatively, the statutes of limitations are tolled by application of the equitable estoppel or fraudulent concealment doctrine. Defendants, through their continuing conduct, have not only mislead consumers about PE's efficacy to induce sales but have further concealed the truth about PE through misinformation, actively preventing Plaintiff from not only discovering any injury but promptly suing even after injury is discovered. Defendants are estopped from relying on any applicable limitations period as a result.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following proposed classes (collectively referred to as "Class"):

> All natural persons in the United States who purchased one or more of Defendant J&J's Products in the United States for personal or household use ("Nationwide J&J Class").

> All natural persons in the United States who purchased one or more of Defendant Kenvue's Products in the United States for personal or household use ("Nationwide Kenvue Class").

> All natural persons in the United States who purchased one or more of Defendant McNeil's Products in the United States for personal or household use ("Nationwide McNeil Class").

All natural persons in the United States who purchased one or more of Defendant Reckitt's Products in the United States for personal or household use ("Nationwide Reckitt Class").

51.    In addition, the state subclasses are defined as follows:

All natural persons in the state of Texas who purchased one or more of J&J's Products in the State of Texas for personal or household use ("Texas State J&J Subclass").

All natural persons in the state of Texas who purchased one or more of Kenvue's Products in the State of Texas for personal or household use ("Texas State Kenvue Subclass").

All natural persons in the state of Texas who purchased one or more of McNeil's Products in the State of Texas for personal or household use ("Texas State McNeil Subclass").

All natural persons in the state of Texas who purchased one or more of Recikitt's Products in the State of Texas for personal or household use ("Texas State Reckitt Subclass").

52.    **Numerosity and Ascertainability:** The number of Class Members is so numerous that joinder of all Class Members is impracticable. Plaintiff does not know the exact size of the Class or identity of the Class Members but, upon information and belief, believes there to be at least tens of thousands of purchasers of Defendants' Products who have been damaged by Defendants' conduct as

alleged herein. Class Members may also be readily identified from Defendants'
records.

53.    **Commonality and Predominance:** This action involves common
questions of law and fact which predominate over any question solely affecting
individual Class Members. These common questions include:

- whether Defendants' Products contained phenylephrine;

- whether Defendants' marketing statements are false, misleading, or
objectively reasonably likely to deceive;

- whether Defendants' alleged conduct constitutes violation of the laws
asserted;

- whether Defendants' alleged conduct violates public policy;

- whether Defendants engaged in false and/or misleading advertising;

- whether Defendants were unjustly enriched as a result of their
labeling, marketing, advertising and/or selling of the Products;

- whether Plaintiff and Class Members are entitled to damages and/or
restitution and the proper measure of that loss; and

- whether Plaintiff and Class Members are entitled to injunctive relief to
prevent Defendants from continuing to market and sell Products that
lack efficacy.

54.    **Typicality**: Plaintiff's claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendants' substantially uniform misconduct, as described above. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other members of the Class that she represents, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and Class Members arise from the same operative facts and are based on the same legal theories.

55.    **Adequacy**: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiff and her counsel.

56.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiff and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be virtually impossible for the Class Members to individually seek redress for Defendants'

wrongful conduct. Even if Class Members could afford individual litigation, the court system could not: individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## CAUSES OF ACTION

**A.    Claims Brought on behalf of the Nationwide Class:**

### COUNT ONE — UNJUST ENRICHMENT

57.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

58.    Plaintiff and Class Members conferred a monetary benefit on Defendants in the form of monetary payments from purchases of Defendants' Products.

59.    As a result of Defendants' wrongful and deceptive acts alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiff and Class Members when they purchased Defendants' Products.

60.    In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and Class Members.

61.    Under principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and Class Members because Defendants engaged in wrongful and deceptive acts resulting in Plaintiff overpaying for Defendants' Products.

62.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by Defendants. A constructive trust should be imposed upon all unlawful and inequitable sums received by Defendants traceable to Plaintiff and the Class.

## COUNT TWO — BREACH OF IMPLIED WARRANTY OR MERCHANTABILITY

63.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

64.    At all times relevant, all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose.[41]

---

[41] At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Corn. Code § 2313; Cob. Rev. Stat. § 4-2-313; Conn.

65.     Defendants were at all times a "merchant" within the meaning of Article 2 of the U.C.C., as codified under applicable law with respect to the Products which were sold to Plaintiff.

66.     The Products are and were "goods" within the meaning of Article 2 of the U.C.C., as codified under applicable law.

67.     Each of the Defendants was obligated to provide Plaintiff and the Class Members Products that were merchantable quality, were reasonably fit for the ordinary purpose for which they were sold and conformed to standards of trade.

68.     Defendants impliedly warranted that their Products were of merchantable quality and fit for their ordinary purpose.

---

Gen. Stat Ann. § 42a-2-313; 6 Del. Code. § 2¬313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat § 490:2- 313; Idaho Code § 28-2-313; 810 III. Comp. Stat Ann. 5/2-313; Ind. Code Ann. § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 3361-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382-A:2-313; NJ. Stat Ann. § 12A:2-313; N.M. Stat Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. ;72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, et seq.; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A-2-313; Va. Code § 8.2¬313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313; and Wyo. Stat § 34.1-2-313.

69.     Defendants breached their implied warranties because their Products were not of merchantable quality and fit for their ordinary purpose.

70.     Defendants' breaches of implied warranties were a direct and proximate cause of Plaintiff's and the other Class Members damages.

## COUNT THREE — FRAUD BY OMISSION/CONCEALMENT

71.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

72.     Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to Plaintiff and Class Members the true nature of the effectiveness of their Products. Defendants intentionally and knowingly falsely concealed, suppressed and/or omitted material facts including as to the standard, quality or grade of their Products. These materials facts, as set forth above, were material because Plaintiff and Class Members reasonably attached importance to them when purchasing Defendants' Products.

73.     Defendants had a duty to disclose these omitted facts because they were known and/or accessible only to Defendants due to their exclusive and superior knowledge of the Products.

74.     Defendants failed to disclose these material facts with the intent to induce Plaintiff and other Class Members to purchase their Products.

75.    Plaintiff and Class Members placed trust and confidence in Defendants due to their status as merchants of healthcare related products.

76.    Plaintiff and Class Members would not have purchased Defendants' Products but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Products or would have paid less for the Products.

77.    As a result of Defendants' omissions, Plaintiff and other Class Members have suffered actual damages including, but not limited to, their lost benefit of the bargain and overpayment of purchase of the diminished intrinsic value of the Products.

78.    Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts.

79.    Defendants acted with malice, oppression, and fraud.

80.    Plaintiff and Class Members reasonably relied on Defendants' knowingly false concealment and omissions. As a direct and proximate result of Defendants' omissions and active concealment of material facts regarding the Products, Plaintiff and Class Members have suffered actual damages in an amount to be determined at trial.

**B.    Claims Brought on behalf of the Texas State Subclass:**

### COUNT FOUR — VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
### Tex. Bus. & Com. Code Ann. § 17.41, *et. seq.*

81.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

82.    Plaintiff brings this claim pursuant to the Texas Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et. seq.*, individually and on behalf of the Texas State Subclasses who were subject to Defendants' above-described conduct.

83.    Plaintiff and Defendants are "persons" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(3).

84.    Plaintiff and Class Members are "consumers" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(4).

85.    Defendants' Products are "goods" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(1).

86.    Defendants were engaged in "trade" and/or "commerce" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(6).

87.    The Texas Deceptive Trade Practices Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code Ann. § 17.46(a), and

an "unconscionable action or course of action." Tex. Bus. & Com. Code Ann.
§§ 17.45(a), 17.50(a)(3).

88.    In the course of their businesses, Defendants violated the Texas
DTPA. As detailed above, Defendants willfully failed to disclose the truth about
the effectiveness of their Products to provide sinus/nasal congestion relief with the
intent that consumers would be induced to purchase their Products. By failing to
disclose that their Products were ineffective in relieving sinus/nasal decongestion,
Defendants engaged in one or more of the following unfair or deceptive acts as
defined in Tex. Bus. & Com. Code § 17.46:

A.    Representing that goods or services have s uses, benefits, or quantities
which they do not have or that a person has a sponsorship, approval,
status, affiliation, or connection which the person does not" Tex. Bus.
& Com. Code § 17.46(a)(5);

B.    Representing that goods or services are of a particular standard,
quality, or grade, or that goods are of a particular style or model, if
they are of another; Tex. Bus. & Com. Code § 17.46(a)(7); and

C.    Failing to disclose information concerning goods or services which
was known at the time of the transaction if such failure to disclose
such information was intended to induce the consumer into a

transaction into which the consumer would not have entered had the information been disclosed. Tex. Bus. & Com. Code § 17.46(a)(24).

89.     Defendants' failure to disclose the true characteristics of the Products were material to Plaintiff and Texas State Subclass members' decision to purchase the Products, as Defendants intended. Had Plaintiff and the Texas State Subclass known the truth, Plaintiff and the Texas State Subclass would not have purchased the Products, or—if the Products true nature had been disclosed, Plaintiff and Texas State Subclass members would have paid significantly less for the Products.

90.     Plaintiff and the Texas State Subclass members had no way of discerning that Defendants' representations were false and deceptive, or otherwise learning the facts that Defendants failed to disclose.

91.     Defendants had an ongoing duty to Plaintiff and the Texas State Subclass members to refrain from unfair and deceptive practices under the Texas DTPA in the course of their business. Specifically, Defendants owed Plaintiff and the Texas State Subclass members a duty to disclose all material facts concerning the efficacy of their Products and possessed exclusive knowledge and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

92.     Plaintiff and the Texas State Subclass members reasonably relied on Defendants' knowingly false and deceptive statements. As a direct and proximate

result of Defendants' false statements and active concealment of material facts regarding the Products, Plaintiff and Texas State Subclass members have suffered actual damages in an amount to be determined at trial.

93.    Defendants' violations present a continuing risk to Plaintiff and the Texas State Subclass members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

94.    Pursuant to, Tex. Bus. & Com. Code § 17.50, Plaintiff and the Texas State Subclass members seek an order enjoying Defendants' deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Texas DTPA.

### COUNT FIVE — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Tex. Bus. & Com. Code Ann. § 2.314

95.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

96.    Plaintiff brings this claim pursuant to Tex. Bus. & Com. Code Ann. § 2.314, *et. seq.*, individually and on behalf of the Texas State Subclasses who were subject to Defendants' above-described conduct.

97.    Defendants were at all times a "merchant" within the meaning of Tex. Bus. & Com. Code Ann. §§ 2.104(a), and "sellers" withing the meaning of Tex.

Bus. & Com. Code Ann. §§ 2.103(a)(4), with respect to the Products which were sold to Plaintiff and Class Members.

98.    Plaintiff and Class Members are "buyers" within the meaning of Tex. Bus. & Com. Code Ann. § 2.103(a).

99.    The Products are and were "goods" within the meaning of Tex. Bus. & Com. Code Ann. § 2.105.

100.    Defendants impliedly warranted that their Products were of merchantable quality and fit for their ordinary purpose pursuant to Tex. Bus. & Com. Code Ann. § 2.314.

101.    Accordingly, each of the Defendants was obligated to provide Products to Plaintiff and the Class Members that were merchantable quality, were reasonably fit for the ordinary purpose for which they were sold and conformed to standards of trade.

102.    Defendants knew or had reason to know of the specific use for which the Products were purchased. Defendants provided Plaintiff and Class Members with an implied warranty that the Products were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Products were manufactured, supplied, distributed, and sold by Defendants, were effective in providing sinus/nasal decongestion relief.

103.   By failing to disclose that their Products were ineffective in relieving sinus/nasal decongestion, Defendants breached their implied warranties because their Products were not of merchantable quality and fit for their ordinary purpose:

104.   Defendants' breaches of implied warranties were a direct and proximate cause of Plaintiff's and the other Class Members' damages.

105.   Plaintiff and the Texas State Subclass members seek an order awarding damages, punitive damages, and any other just and proper relief pursuant to Tex. Bus. & Com. Code Ann. §§ 2.714 & 2.715.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and on behalf of the proposed Class and Subclass, request that the Court:

a.     Certify this case as a class action, appoint Plaintiff as a class representative, and appoint Plaintiff's Counsel as Class Counsel for Plaintiff to represent the Class and Texas State Subclasses;

b.     Find that Defendants have committed the violations alleged herein;

c.     Award Plaintiff and Class Members appropriate relief, including actual and statutory damages, restitution and disgorgement;

d.     Award equitable, injunctive and declaratory relief as may be appropriate;

e.    Award all costs, including experts' fees and attorneys' fees, and the costs of prosecuting this action;

f.    Award pre-judgment and post-judgment interest as prescribed by law; and

g.    Grant additional legal or equitable relief as this Court may find just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Date: October 6, 2023                    Respectfully submitted,

*/s/ James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI,
   BRODY, & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

Cari Campen Laufenberg
claufenberg@kellerrohrback.com
Derek W. Loeser
dloeser@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.:  (206) 623-1900
Fax:  (206) 623-3384

*Attorneys for Plaintiff*